UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MARIA  JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | No. 1:10-cv-01656-SEB-DML |
| ELI LILLY  & COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is now before the Court on Defendant's Motion for Summary Judgment [Docket No. 54], filed on November 23, 2012.  Plaintiff, Maria Jones, brings this action against her former employer, Defendant, Eli Lilly & Company ("Lilly"), alleging that Lilly denied her a promotion because of her race (African-American) and terminated her in retaliation for her complaints of discrimination, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*[1]  For the reasons detailed in this entry, we GRANT Defendant's Motion for Summary Judgment.[2]

**Factual Background**

---

[1] This case is related to others before the Court all of which were originally part of a class action complaint.  *See Welch v. Eli Lilly & Co.*, 1:06-cv-00641-RLY-DML.  The class action was never certified and the individual cases were severed on September 29, 2010.  We now rule on the individual cases that were assigned to the undersigned judge.

[2] On January 9, 2013, Ms. Jones filed a Motion for Oral Argument on Defendant's Motion for Summary Judgment [Docket No. 67].  Because we are able to rule based solely on the parties' written submissions, Plaintiff's Motion for Oral Argument is hereby DENIED.

Lilly is a global pharmaceutical company that develops and manufactures pharmaceutical products.  Ms. Jones began working for Lilly in 1978 as a Staff Secretary. In 1982, she moved to the position of Computer Operator, and, beginning in 1983, she moved to the position of Computer Systems Technician.  From 1983 until her termination on November 21, 2011, Ms. Jones held non-supervisory positions in various information technology ("IT") functions.  In 1986, while working for Lilly, Ms. Jones attained an Associate's Degree in Computer Technologies from IUPUI.  It is undisputed that Ms. Jones was highly competent in her work, a fact that was recognized in various ways during her tenure.

After receiving a succession of promotions in non-exempt positions, Ms. Jones was promoted to an exempt position in 1989, going from pay grade level ("PGL") 26 to PGL 50.  Ms. Jones alleges that throughout the eight year period between 1981 and 1989, she had attempted on numerous occasions to obtain the status of an exempt employee, but had been repeatedly denied such a promotion until 1989.  After she obtained exempt employee status, Ms. Jones was promoted three more times during her tenure with Lilly: (1) from PGL 50 to PGL 52 in 1996; (2) from PGL 52 to PGL 54 in 1999; and (3) from PGL 54 to PGL 56 in 2002, which, according to Lilly, is the highest level most IT professionals within Ms. Jones's department were reasonably expected to reach. According to Ms. Jones, she was only at the 8% level of range of pay for the position, however.[3]

---

[3] Lilly explains its salary percentage range methodology as follows:

When Ms. Jones received her promotion in 2002, her supervisor was Mari
Gunderson.  Ms. Jones received the top performance (5 out of 5) rating for her work in
2002 and also received a special stock option grant in recognition of her contributions
that year to Lilly.  Following her performance in 2002, Ms. Jones had achieved a 17%
level in her range of pay after receiving an adjustment in April 2003.  A range adjustment
in October 2003 moved her to a 10% level in her range of pay.  Jones Aff. ¶ 9.

Not long after she was promoted in 2002, Ms. Jones applied for a position on a
newly-created team in Lilly's Pharmaceutical Delivery Systems ("PDS") area.  Angela
Elliott, the supervisor of the PDS team, selected Ms. Jones for the position and Jones
began working in PDS and reporting to Ms. Elliott in January or February of 2003.
According to Ms. Elliott, Ms. Jones struggled with developing coworker relationships
and in recognizing and implementing organizational strategies and thus, during Ms.
Jones's June 2003 interim performance review, Ms. Elliott outlined several areas in
which Ms. Jones should work to improve her performance, including: her relationships

---

[P]ercentage in range is a mathematical calculation effecting the position of an
employee's salary base in the salary range for his or her [PGL]. Accordingly, the
"reasons" for any given employee's percentage in range at any particular point in
time are determined by the reasons for their corresponding base salary and PGL.
Lilly's Salary Scales and Guidelines explain the relevant compensation practices
that … impact[] an employee's position in salary range during the requested time
period.  As described more fully in those guidelines, certain pay adjustments
(such as merit pay increases) [are] based, in part, on the employee's performance,
while other pay adjustments [are not].  As further described in those guidelines,
certain promotional increases (sometimes referred to as "bona fide" promotions)
[are] based on the employee applying for and obtaining a different job, while
others (i.e., in line promotions) [are not].  Because of the multiple variables that
can factor into an employee's PGL and compensation, including the employee's
own choices regarding his or her career, it is not [practical] to attempt to state "all
reasons" … an employee is at a particular percentage in range at a particular time.
Pl.'s Exh. B at 5, Resp. to Interrog. No. 4.

with other team members and internal customers; her receptivity to feedback; her

tendency to quote from manuals instead of assisting teammates in understanding the

application of written guidelines to specific situations; and her tendency to lose sight of

broader strategic initiatives while immersed in the details of implementation.  Elliott Dep.

at 60-64.

        According to Ms. Jones, at her June 2003 interim performance review, Ms. Elliott

stated that Ms. Jones was not performing up to standards and that if she did not improve

"there would be serious consequences."  Jones Aff. ¶ 11.  Ms. Elliott further indicated

that if Ms. Jones received a negative review in December 2003, Ms. Elliott would take

the necessary steps to demote Jones.  *Id.*  During the review, Ms. Elliott also informed

Ms. Jones that she could seek employment in another area of Lilly if she desired.  *Id.*  Ms.

Jones alleges that prior to the 2003 interim review she had routinely met with Ms. Elliott

on a one-on-one basis and provided her with weekly status reports, and at no time during

those meetings had Ms. Elliott ever indicated that Ms. Jones's performance was deficient.

*Id.* ¶ 13.  According to Ms. Jones, Ms. Elliott based her interim evaluation in large part

on her discussions with other PDS employees and the alleged "problems" each had with

Jones.  *Id.* ¶ 12.  Ms. Jones contends that she also spoke with these unidentified

employees, and they indicated that they had positive evaluations of her performance.  *Id.*

        Immediately following the June 2003 interim review, Ms. Jones complained to

Elizabeth Ackley of Lilly's Human Resources Department regarding Ms. Elliot's

treatment, alleging that Ms. Elliott treated Jones and other African American employees

in a discriminatory fashion based on their race.  During that conversation, Ms. Jones informed Ms. Ackley that she believed race discrimination was a cause of her poor interim review.  According to Lilly, its Human Resources Department ("HR") conducted a thorough investigation and found no evidence to support Ms. Jones's contention that race played a role in Ms. Elliott's actions.

Following Ms. Jones's lodging of her complaint with HR, her relationship with Ms. Elliott grew increasingly strained.  According to Ms. Jones, Ms. Elliott began to baselessly rebuke her for performance issues on an almost daily basis, often yelling at her in front of other employees, while not treating Caucasian employees in a similar fashion. One of Ms. Jones's co-workers, Donna Williams, a Lilly employee in PDS who worked with Ms. Elliott and Ms. Jones as their direct supervisor, testified that she observed Ms. Elliott's treatment of Jones to grow worse following Ms. Jones's complaint to HR. According to Ms. Williams, on one occasion in August 2003, she observed Ms. Elliott yelling at Ms. Jones to such a degree that Ms. Jones began crying.  Following that incident, Ms. Williams complained to Ms. Ackley in HR regarding Ms. Elliott's treatment of Ms. Jones.  Ms. Jones also lodged further complaints to HR regarding what she described as Ms. Elliott's abusive behavior towards her, which prompted an investigation of Ms. Elliott for harassment pursuant to Lilly's internal EEO processes. On August 23, 2003, Ms. Jones was informed by HR that the department's investigation revealed no harassment of her had been perpetrated by Ms. Elliott.

Following that finding, Ms. Jones requested and in October 2003 was eventually granted a transfer from the PDS position. Although Ms. Jones left the PDS department in October, Ms. Elliot was given primary responsibility for completing Jones's 2003 year end Performance Management evaluation. Based on Ms. Elliott's input, Ms. Jones received an evaluation rating for 2003 of a "2" (out of 5), which is considered a negative evaluation in Lilly's evaluation system. Despite this poor review, Ms. Jones received a merit increase in 2004 based on her 2003 performance. However, Ms. Jones contends the low score hindered her future advancement within Lilly and also had a detrimental effect on her salary levels from that point forward. This was the lowest review Ms. Jones had ever received during her long tenure with Lilly; indeed, it was her only negative review over thirty-some years. Ms. Jones complained about the score, but Lilly did not revise it.

From 2004 through 2012, Ms. Jones reported to six different supervisors, including Deborah Brown, Anita Morrison, Karen Walker-Anderson, Mari Gunderson, Kevin Stringer, Kim Young, and Sheldon Ort. During that period (with the exception of a company-wide 2009 job restructuring discussed further below), Ms. Jones received base pay increases and bonuses every year, although she remained in the same PGL 56 pay position and continued to be on the low end of the PGL 56 pay range despite positive performance reviews. Throughout that time period, Ms. Jones expressed interest numerous times in becoming a Subject Matter Expert ("SME"), but she was not ever given SME work to perform. Lilly contends its refusal to assign SME tasks to her was

because Ms. Jones's telecom responsibilities for which she was a designated expert were too involved to allow her to be pulled away to perform additional SME duties.

In 2007, Ms. Jones became a named plaintiff in a putative class action lawsuit against Lilly alleging race discrimination. In 2009, Ms. Jones filed an anonymous complaint via Lilly's Employee Hotline alleging that African Americans were not promoted within Lilly's IT department at the same rates as non-African Americans. HR conducted an investigation and determined there was no evidence to support Ms. Jones's claims. Ms. Jones is not aware of anyone at Lilly who ever identified her as the source of that complaint, but in July 2009, Garret Young from HR informed her that, although he could not discuss the details, the issue she had raised had been addressed. Thereafter, on November 13, 2009, Ms. Jones filed a new charge of race discrimination against Lilly with the Equal Employment Opportunity Commission ("EEOC").

In 2009, Lilly instituted a company-wide pay restructuring in which numeric pay grade levels were replaced with alphanumeric pay grades. Because the resulting alphanumeric pay grades for IT did not correspond to the previous numeric pay grade levels, members of management and HR collaborated to develop new alphanumeric designations for each IT position based on the duties and responsibilities of the specific position. The factors and process used to determine merit pay increases did not change as part of the restructuring. Ms. Jones does not know who made the decisions with respect to the manner in which the IT positions were to be restructured nor does she know what factors were considered in that regard.

Following the restructuring, Ms. Jones's position was changed in the new system from a PGL 56 position to a level "P3" position, which revision Jones contends was essentially a demotion given that her pay scale range was reduced as a result of the change.[4]  Ms. Jones was informed by her supervisor that it would be very hard to advance out of that range and in fact Jones remained in a P3 position until her termination on November 21, 2011.  Several non-African American employees within Lilly's IT department, including Cheryl Amick and Michael Cesnik, held positions at PGL 56 before the restructuring and whose positions, like Ms. Jones's, were also converted to the P3 level.  One Caucasian employee in Ms. Jones's department, F. Joe Cavanaugh, held a position that was classified at a higher level following the reorganization.  According to Lilly, Mr. Cavanaugh's position was converted to the "P4" level because unlike the positions Ms. Jones, Ms. Amick, and Mr. Cesnik held, Mr. Cavanaugh's role included significant responsibility for enterprise- or company-wide compliance projects.

Ms. Jones alleges that she was consistently paid less than Caucasian employees who worked with her, namely Mr. Cavanaugh, despite being employed for a longer period of time.  Ms. Jones also points to Ms. Amick as another Caucasian employee who was paid more than she was.  The following tables detail each employee's annual pay.

Ms. Jones's annual pay totals from 2001 to 2011 were as follows:

---

[4] Ms. Jones's salary itself was not reduced by virtue of the restructuring, but as a result of the restructuring she, like a number of other non-African American employees, received no merit pay increase in 2010.

| Year | Annual Pay | Pay Level | Supervisor |
|------|-----------|-----------|------------|
| 2001 | $64,620 | 54 | -- |
| 2002 | $64,620/$67,020 | 54/56 | Gunderson |
| 2003 | $72,120/$75,120 | 56 | Elliot/Brown |
| 2004 | $77,760 | 56 | Brown/Anderson/Walker |
| 2005 | $81,448 | 56 | Anderson/Walker |
| 2006 | $87,964 | 56 | Anderson/Walker |
| 2007 | $94,121 | 56 | Anderson/Walker |
| 2008 | $97,415 | 56 | Gunderson |
| 2009 | $100,337 | 56/P3 | Gunderson |
| 2010 | $100,337 | P3 | Stringer |
| 2011 | $100,337 | P3 | -- |

Mr. Cavanaugh's annual pay totals from 2002 until 2011 were as follows:

| Year | Annual Pay | Pay Level | Supervisor |
|------|-----------|-----------|------------|
| 2002 | $87,120 | 56 | Brown/Morrison |
| 2003 | $90,780 | 56 | Morrison |
| 2004 | $95,460 | 56 | Morrison |
| 2005 | $100,138 | 56 | Morrison/Pickett |
| 2006 | $103,142 | 56 | Pickett/Beach |

| 2007 | $107,268 | 56 | Beach |
| 2008 | $109,413 | 56 | Beach/Gunderson |
| 2009 | $109,413 | 56/P4 | Gunderson |
| 2010 | $109,413 | P4 | Gunderson/Eckhart |
| 2011 | $109,413 | P4 | -- |

Ms. Amick's annual pay totals from 2001 to 2011 were as follows:

| Year | Annual Pay | Pay Level | Supervisor |
|------|-----------|-----------|------------|
| 2001 | $79,920/$82,920 | 54 | -- |
| 2002 | $82,920 | 56 | Morrison/Scholl |
| 2003 | $83,040 | 56 | Morrison |
| 2004 | $88,140 | 56 | Morrison |
| 2005 | $90,167 | 56 | Pickett |
| 2006 | $92,421 | 56 | Beach |
| 2007 | $95,194 | 56 | Beach |
| 2008 | $98,050 | 56 | Gunderson |
| 2009 | $100,992 | 56/P3 | Gunderson |
| 2010 | $100,992 | P3 | Gunderson |
| 2011 | $100,992 | P3 | Gunderson |

Based on this data, Ms. Jones contends that she was paid $123,000 less than Mr. Cavanaugh between 2003 and 2011 and that, when assessing the average pay differential among all three employees during that same time period, she was paid a total of $80,000 less.  Ms. Jones also alleges that another of her team members, Jennifer Stamm (a Caucasian female), was hired in 2001 at PGL 50 and, despite not holding a college degree, she received a promotion to PGL 52 just three years later and a promotion to PGL 54 in 2008.  By comparison, it took ten years for Ms. Jones to move from PGL 50 to PGL 54, and then she remained in PGL 56 for approximately six years.

In the summer of 2011, Lilly reorganized its IT functions and eliminated a number of positions.  Ms. Jones along with many other employees was placed on what Lilly refers to as "reallocation status."  Pursuant to Lilly's standard practice, Ms. Jones (and every other affected employee) was given a specific of time period within which she could search for and secure a new position.  However, as was true for a number of her coworkers, Ms. Jones failed to locate an alternative position.  Thus, her employment was administratively terminated in November 2011.[5]

## **Legal Analysis**

## I.    **Standard of Review**

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

---

[5] Ms. Jones does not suggest that her inclusion in the reorganization or her failure to obtain an alternative position during the allotted time period is attributable to any discriminatory reason.

matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Disputes concerning material facts are genuine where the evidence is such that a

reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material

fact exist, the court construes all facts in a light most favorable to the non-moving party

and draws all reasonable inferences in favor of the non-moving party.  *See id.* at 255.

However, neither the "mere existence of some alleged factual dispute between the

parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the

material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986), will defeat a motion for summary judgment.  *Michas v. Health Cost Controls of*

*Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of

the basis for its motion, and identifying those portions of [the record] which it believes

demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.

The party seeking summary judgment on a claim on which the non-moving party bears

the burden of proof at trial may discharge its burden by showing an absence of evidence

to support the non-moving party's case.  *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle

for resolving factual disputes.  *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th

Cir. 1994).  Therefore, after drawing all reasonable inferences from the facts in favor of

the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the

party opposing the motion, summary judgment is inappropriate.  *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated.  *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element "necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.

A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment.  *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available.  *Seener v. Northcentral Technical Coll.*, 113 F.3d 750, 757 (7th Cir. 1997); *Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353, 354 (7th Cir. 1996).  To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination.  However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is

no genuine dispute as to the material facts. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997).

## II.    Race Discrimination Claims

Ms. Jones alleges that she was discriminated against because of her race, in violation of both 42 U.S.C. § 1981 and Title VII.  The substantive standards and methods of proof that apply to claims of racial discrimination under Title VII also apply to claims under § 1981.  *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 806 (7th Cir. 1999) (citations omitted).  A plaintiff may establish a case of discrimination using either the direct or indirect method of proof.  Ms. Jones has chosen to proceed solely under the indirect method.  Thus, we follow her lead and discuss only that method of proof.

To establish a prima facie case of discrimination using the indirect method, as set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973), a plaintiff must establish that: (1) she was a member of a protected class; (2) she adequately performed her employment responsibilities; (3) despite adequate performance, she suffered an adverse employment action; and (4) she received different treatment than similarly situated persons who were not members of the same protected class.  *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 790 (7th Cir. 2007) (citation omitted).  If the plaintiff is able to make such a showing, the burden shifts to the employer to come forth with a "legitimate, non-discriminatory reason" for its actions.  *Hill v. Potter*, 625 F.3d 998, 1001 (7th Cir. 2010).  If the employer is able to do so, it will prevail unless the plaintiff presents evidence that the employer's given reason is merely a pretext for

14

discrimination.  *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 551 (7th Cir. 2011) (citation omitted).

### A.  Disparate Pay History

Ms. Jones alleges generally that based on her race she received a significantly lower salary than certain Caucasian coworkers, namely, Cheryl Amick and Joe Cavanaugh.  Pl.'s Resp. at 16-17.  Lilly argues that Ms. Jones's disparate pay claim fails because, among other deficiencies, she has failed to show that Ms. Amick or Mr. Cavanaugh was similarly situated to her.  We agree that Ms. Jones's allegations fall short of that required mark.

In evaluating whether two employees are directly comparable, a plaintiff typically must show that a comparator had the same supervisor; was subject to the same standards; and "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012).  To be similarly situated, an employee must be comparable to the plaintiff "in all *material* respects."  *Warren v. Solo Cup Co.*, 516 F.3d 627, 630-31 (7th Cir. 2008) (emphasis in original and citation and internal quotations omitted).  We are mindful that this does not mean the employee must be "identical in every conceivable way," *Coleman*, 667 F.3d at 846, as the court is "looking for comparators, not clones." *Id.* (internal quotation marks and citations omitted). However, though the similarly situated inquiry is to be flexibly applied, a plaintiff cannot simply pick and choose the employees to whom she compares herself or the factors that

15

are to be assessed in making this inquiry.  Instead, "[w]hich factors are material is a case-specific inquiry that depends on the specifics of the defendant's decision and the stated reason for it."  *Good v. Univ. of Chicago Med. Ctr.*, 673 F.3d 670, 675-76 (7th Cir. 2012) (citing *Coleman*, 667 F.3d at 847-52).

Ms. Jones has failed to establish that Ms. Amick or Mr. Cavanaugh is similarly situated to her in the ways that are material to this case.  In comparing herself to Cavanaugh and Amick, Ms. Jones emphasizes that she had been employed by Lilly longer and, as compared to Cavanaugh, had attained an academic degree more directly comparable to her IT duties.  However, it is undisputed that under Lilly's procedures and approach neither the length of tenure with the company nor the employee's college major has a bearing on annual merit pay decisions.  Instead, the evidence adduced establishes without a doubt that annual merit pay increases (when awarded) are based on the supervisor's rating, the employee's PGL, the employee's current percent-in-range, and the relevant supervisor's budget.  Ackley Aff. ¶ 8.  Accordingly, any employee's pay at a particular point in his or her career is a function of the combination of the prior years' pay decisions.  *Id.* ¶ 10.

Moreover, Ms. Jones ignores differences that are in fact germane to Lilly's pay decisions.  For example, unlike Ms. Jones, Mr. Cavanaugh began performing IT work immediately upon hiring in at PGL 54 in 1991, at a time when Jones was still in a PGL 50 role.  With regard to Ms. Amick, Ms. Jones ignores the fact that she (Ms. Amick) was hired directly into PGL 52 over a decade after Ms. Jones's own hire.  Ms. Jones likewise

16

disregards the fact that she did not share a common supervisor with Mr. Cavanaugh or Ms. Amick until 2008, by which time the cumulative impact of different starting times, different PGLs, and different supervisors' evaluations had already created race-neutral salary differences between Ms. Jones and her alleged comparators, respectively. *See Taylor v. Eli Lilly & Co.*, No. 1:10-cv-01611-TWP-DML, 2012 WL 4467655, at *7 (S.D. Ind. Sept. 26, 2012) (Walton Pratt, J.) (finding comparators not similarly-situated with respect to claim regarding merit pay where they reported to different supervisors, and different supervisors made the annual evaluation upon which merit pay decisions are in part based). For these reasons, it is clear that neither Mr. Cavanaugh nor Ms. Amick is similarly situated to Ms. Jones in any material respects. Having failed to make out a prima facie case of discrimination based on disparate pay, her claim cannot and does not survive summary judgment.

### B. 2009 Job Restructuring

Ms. Jones next alleges that Lilly's decision to convert her PGL 56 position to a P3 rather than a P4 position in the 2009 company-wide restructuring was racially discriminatory. Once again, this claim cannot survive summary judgment because she is unable to satisfy the similarly-situated inquiry under the indirect method of proof. Initially, we note that a number of Ms. Jones's Caucasian co-workers who held PGL 56 positions before the restructuring also had their positions converted to P3, just like Jones. Mr. Cavanaugh is the only individual whom Ms. Jones identifies as being similarly situated to her but whose position was converted to a P4 level as a result of the

restructuring.  Ms. Jones does not dispute that Mr. Cavanaugh was performing work of a different scope than she and the other Caucasian co-workers were, all of whose positions were not converted to P4.  Specifically, unlike the positions that were converted to level P3, Mr. Cavanaugh's position was unique in that it included company-wide responsibilities.  Neither does Ms. Jones dispute that Lilly's restructuring decisions were based on the nature of the position rather than characteristics of the employee in the position.  Given the material distinction between the duties required in Ms. Jones's position compared to Mr. Cavanaugh's positions, Ms. Jones has failed to satisfy the similarly situated inquiry.  Thus, she has failed to establish a prima facie case of discrimination based on the 2009 job restructuring.

### C. Promotion History

Here, Ms. Jones alleges generally that "non-African American workers" in her department "received promotions and pay raises at a much faster rate than she did."  Pl.'s Resp. at 17.  Ms. Jones specifically identifies only Jennifer Stamm as being a potential comparator with respect to their promotion histories,[6] focusing solely on the fact that Ms. Stamm was able to progress from PGL 50 to PGL 54 in seven years, while it took her ten years to make the same jump.  But it is undisputed that under Lilly's system, technical promotions such as the type at issue here are not automatic, time-based promotions.

---

[6] To the extent Ms. Jones is referring to anyone other than Ms. Stamm (or Mr. Cavanaugh and Ms. Amick with regard to disparate pay allegations), her failure to develop any such claim beyond the conclusory statements cited above dooms her claim.  *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 615 (7th Cir. 2001) (holding that "conclusory assertions" that plaintiff was treated differently, without specific evidence, will not satisfy the similarly-situated inquiry").

Rather, Lilly's technical promotions were and are based on the individual employee's demonstration, to their supervisor's satisfaction, of consistent performance of PGL-specific criteria and competencies.

Ms. Jones has proffered no evidence to suggest that she and Ms. Stamm are similarly-situated under the relevant facts in this case, to wit, evidence of Stamm's assignments, performance, and/or evaluations preceding her promotions or of the identity of the individual(s) who decided to award her promotions and how those factors arguably compared to Jones. Because Ms. Jones has entirely failed to establish or otherwise substantiate the similarly-situated inquiry, her discrimination claim based on promotion history cannot survive summary judgment.

### D. Treatment by Ms. Elliott

Ms. Jones next alleges that her supervisor, Ms. Elliott, treated her and other African American employees less favorably than she treated Caucasian employees. In support of this contention, she cites the poor reviews she received from Ms. Elliott on the 2003 interim and final performance evaluations. Ms. Jones also alleges that Ms. Elliott consistently engaged in harassing behavior towards her and other African American employees.

Initially, we are not persuaded that the treatment of which Ms. Jones complains, to wit, her 2003 performance evaluations and Ms. Elliott's pattern of yelling at her, are adverse employment actions. An adverse employment action "is a significant change in

the claimant's employment status such as hiring, discharge, denial of promotion, reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits." *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (citation omitted).  Here, the treatment allegedly suffered by Ms. Jones is insufficient to meet this standard.  *See, e.g.*, *Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir. 2010) (finding that a negative evaluation without more is not an adverse action); *Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) (holding that being stared and yelled at are not adverse employment actions under the broader standard applicable to retaliation claims); *Fulmore v. Home Depot, U.S.A., Inc.*, No. 1:03-cv-0797-DFH-VSS, 2006 WL 839460, at *15 (S.D. Ind. Mar. 30, 2006) (holding that manager yelling and putting his finger in plaintiff's face was not an adverse employment action).

Even if the 2003 poor performance reviews and Ms. Elliott's allegedly aggressive, critical behavior were adverse employment actions, Ms. Jones has failed to identify similarly situated Caucasian employees who received more favorable treatment, and also has failed to show Lilly's explanation for these incidents was a pretext for discrimination. Ms. Jones contends that Ms. Elliott's evaluations of her performance "had no basis in fact" and were more "critical" than Ms. Elliott's assessments of Caucasian employees. But Ms. Jones has identified no employees whatsoever as comparators, much less offered information about the type and quality of the work performed by any potential comparator, the interpersonal skills of any comparator, or any other factors used by Lilly to evaluate employees.  Thus, no meaningful comparison can be made by the Court in

assessing Ms. Jones's allegations and no reasonable inference of pretext can be drawn from the alleged differences in Ms. Elliott's treatment of Ms. Jones and unnamed Caucasian employees.

The testimony of Ms. Jones and her co-worker Ms. Williams that Ms. Elliott treated Jones and other unidentified African American employees less favorably than unidentified Caucasian employees is likewise insufficient to stave off summary judgment. Such conclusory allegations do not create a genuine issue of material fact as to either the similarly situated or the pretext inquiries, undermining the viability of Ms. Jones's discrimination claim based on Ms. Elliott's treatment.

### E. SME Roles

Ms. Jones also alleges that her failure to be given an SME role during the time she reported to Karen Walker-Anderson was improperly based on her race. A review of this claim establishes that it fares no better than the other discrimination claims since she has presented no evidence to establish that her failure to receive an SME role can properly be considered an adverse employment action. *See Traylor v. Brown*, 295 F.3d 783, 788-89 (7th Cir. 2002) (holding that failure to assign the plaintiff certain duties was not an adverse action where the plaintiff suffered no loss in title or job responsibility and presented no evidence beyond her own belief that she had suffered a deprivation of the "building blocks" for promotion). Nor has Ms. Jones attempted to establish that she was similarly-situated to those who received such roles.

Moreover, even if Ms. Jones had succeeded in establishing a prima facie case of discrimination, she has failed to put forth any evidence that casts suspicion on Lilly's proffered nondiscriminatory reason for denying her an SME role, to wit, that the telecom duties assigned to her and for which she was a recognized expert were so significant and substantial that giving her extra SME duties was not be feasible.  Accordingly, Ms. Jones's discrimination claim based on her failure to receive an SME role is a nonstarter, incapable of withstanding summary judgment.

## III.    Retaliation Claims

To establish a claim of retaliation under Title VII, a plaintiff must establish that she engaged in statutorily protected activity, she suffered a materially adverse action, and there was a causal relation between the two events.  *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008).  "As with discrimination claims, a plaintiff may establish retaliation under the direct or indirect method of proof."  *Porter v. City of Chicago*, 700 F.3d 944, 957 (7th Cir. 2012) (citation omitted).  Under the direct method of proof, if, as is the case here, there is no admission of retaliatory animus, a plaintiff can alternatively present a "'convincing mosaic' of circumstantial evidence" sufficient to satisfy the causation element.  *See Rhodes*, 359 F.3d at 504 (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)).  The indirect method requires the plaintiff to present evidence of comparators who were similarly-situated to the plaintiff and engaged in protected activity, but whom the employer did not subject to the same adverse action as the plaintiff.  *See Porter*, 700 F.3d at 957.  If the plaintiff makes a prima facie case of

22

retaliation, the employer must come forward to articulate a legitimate nondiscriminatory reason for the adverse employment action.  *Vaughn v. Vilsack*, 715 F.3d 1001, 1006 (7th Cir. 2013) (citation omitted).  If the employer does so, the plaintiff must offer proof that the employer's proffered reason is pretextual.  *Id.*

It is not clear by which method Ms. Jones intends to proceed, so we will address both.  In her briefing, Ms. Jones identifies various instances of protected activity in which she engaged and a number of adverse employment actions she alleges that she subsequently suffered, including receiving a poor evaluation and being subjected to harassing treatment from Ms. Elliott, being paid less than her Caucasian co-workers, and essentially being demoted when her position was converted to a P3 level position in the 2009 restructuring.[7]  However, merely identifying instances of protected activity that preceded adverse actions is, by itself, insufficient to create an issue of material fact regarding causation.  *See Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008) (holding that "[s]uspicious timing alone rarely is sufficient to create a triable issue" and "mere temporal proximity is not enough to establish a genuine issue of material fact") (internal quotations marks and citations omitted); *Meister v. Georgia-Pacific Corp.*, 43 F.3d 1154, 1160 (7th Cir. 1995) (observing that the causality requirement "calls for more than a sequential connection") (internal quotation marks and citations omitted).

---

[7] Ms. Jones also alleges that her failure to receive an SME position was retaliatory.  However, for the reasons detailed *infra* in Part II.E, Ms. Jones has not shown that failure to receive an SME position constitutes an adverse employment action.

Ms. Jones's retaliation claims cannot succumb to summary judgment because, as Lilly argues, she has failed in most instances to establish that the individuals allegedly responsible for the adverse actions were ever even aware of her protected activity. *See* Jones Dep. at 143 (Jones did not tell anyone at Lilly that she had submitted an anonymous complaint); 234-35 (Jones does not know whether her supervisor, Ms. Gunderson, was aware of her internal complaints or participation in employment discrimination lawsuit against Lilly); 152-53 (Jones unaware of who made the decision with respect to the restructuring of her position in 2009). Under either method of proof, "there must be some evidence that the person(s) responsible for the decision which adversely impacted [the plaintiff] were aware of her engaging in the protected activity." *Baynham v. Meridian Servs. Corp.*, No. 1:11-cv-0129-TWP-MJD, 2012 WL 3614458, at *13 (S.D. Ind. Aug. 21, 2012) (citation omitted).

To the extent that any decisionmaker was aware of her protected activity, Ms. Jones has failed to establish that those individuals were motivated by such activity at the time they acted contrary to her interests or in a discriminatory fashion. Ms. Jones relies heavily on alleged disparate treatment to support her retaliation claims apparently utilizing the indirect method of proof, but she has failed entirely in casting doubt on the veracity of Lilly's proffered nondiscriminatory reasons for its actions. For example, Ms. Jones contends that the restructuring of her position which effectively demoted her from PGL 56 to P3 in 2009 was retaliatory. As discussed above, Ms. Jones was one of a number of Lilly employees (both African-American and Caucasian) whose positions

24

were similarly restructured.  Ms. Jones points to Mr. Cavanaugh as a similarly-situated Caucasian employee whose position was converted to a P4 as opposed to a P3 position, but has not been able to contradict Lilly's explanation that, unlike her position, Mr. Cavanaugh's position included company-wide responsibilities.  Given this undisputed and material difference, it cannot support an inference of a retaliatory animus on the part of Lilly.

Ms. Jones also alleges that the differences in pay among herself, Mr. Cavanaugh, and Ms. Amick evidences retaliation, given that their supervisor, Ms. Gunderson,  noted no performance differences among them during the time period that she supervised them. But the evidence shows that Jones, Cavanaugh, and Amick were jointly supervised by Ms. Gunderson beginning only in 2008, at which point they had already been receiving different salaries for a number of years based on Lilly's merit pay process.  Because they were already being paid at different rates by the time they were supervised by Gunderson, the fact that they continued to receive variable salaries while under Gunderson's supervision does not, without more, evidence a retaliatory motive.  Ms. Jones has failed to adduce evidence sufficient to establish that the differences in pay among Jones, Cavanaugh, and Amick during the time they were jointly supervised by Ms. Gunderson were due to anything other than the normal application of Lilly's merit pay process. There simply is no indication that this explanation by Lilly is disingenuous or merely a pretext for a retaliatory motive.

With regard to Ms. Elliott's negative performance review of Ms. Jones, "it is not clear whether a negative performance review, standing alone, can ever constitute a materially adverse employment action in the retaliation context." *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1109 (7th Cir. 2012) (collecting cases).  Likewise, as we have previously noted, Ms. Elliott having allegedly yelled at Ms. Jones on a number of occasions is insufficient to rise to the level of an adverse employment action.  *See Stephens*, 569 F.3d at 790 (holding that being stared at and yelled at is not an actionable harm).  Even if the conduct Ms. Jones complains of could be deemed an adverse employment action, she has failed to adduce any additional evidence sufficient to raise an inference of retaliatory intent.  Ms. Jones's allegations that she and other unidentified African American employees were treated less favorably than unnamed Caucasian employees are at best vague and conclusory.  With regard to the performance evaluations performed by Ms. Elliott, the evidence establishes that her rating of Ms. Jones was based on specifically articulated deficiencies no one of which Jones has challenged in any substantive manner to establish retaliatory intent.  Accordingly, Ms. Jones's retaliation claim based on Ms. Elliott's conduct must fail.

## IV.    Conclusion

For the reasons detailed above, Plaintiff's Motion for Oral Argument is <u>DENIED</u> and Defendant's Motion for Summary Judgment is <u>GRANTED</u>.  Final judgment shall issue accordingly.

IT IS SO ORDERED.

26

Date: _____09/06/2013_____          _Sarah Evans Barker_____
                                                 SARAH EVANS BARKER, JUDGE
                                                 United States District Court
                                                 Southern District of Indiana

Distribution:

Ellen E. Boshkoff
FAEGRE BAKER DANIELS LLP - Indianapolis
ellen.boshkoff@faegrebd.com

Joseph C. Pettygrove
FAEGRE BAKER DANIELS LLP - Indianapolis
joseph.pettygrove@FaegreBD.com

Neil L. Henrichsen
HENRICHSEN SIEGEL PLLC
nhenrichsen@HSLawyers.com

Joseph F. DeBelder
HENRICHSEN SIEGEL, P.L.L.C.
jdebelder@hslawyers.com